B. F. SAUL COMPANY, ET AL. *v.* WEST END
PARK NORTH, INC., ET AL.

[No. 189 (Adv.), September Term, 1968.]

708

*Decided October 2, 1968.*

The cause was argued before HAMMOND, C. J., and MAR-BURY, BARNES, McWILLIAMS, FINAN, SINGLEY and SMITH, JJ.

*Hal C. B. Clagett,* with whom were *Thomas A. Farrington* and *Sasscer, Clagett, Powers & Channing* on the brief, for appellants.

*William L. Kahler,* with whom were *DeBlasis & Kahler* on the brief, for corporate appellees.

*Thomas A. Garland, Assistant Attorney Genenal,* with whom was *Francis B. Burch, Attorney General,* on the brief, for State of Maryland, other appellee.

Amicus curiae brief filed by Maryland Bankers Association. *Norwood B. Orrick* on the brief.

FINAN, J., delivered the opinion of the Court.

This is an appeal from a declaratory decree entered in equity by the Circuit Court for Prince George's County pursuant to the Uniform Declaratory Judgment Act Code (1967 Repl. Vol.), Art. 31A §§ 1-16 construing Chapter 453, 1968 Laws of Maryland (House Bill No. 11) which repeals §§ 1-16 of Art. 49 of the Maryland Code entitled "Interest and Usury" and replaces it with §§ 1-11. The new law, hereinafter referred to as the Act, had an effective date of July 1, 1968.

The three plaintiffs are corporations whose principal business is residential construction and development and the three defendants are corporate lenders. In each instance the defendant had entered into a contract with the plaintiff to supply it with money for the permanent financing of mortgage loans to be made to prospective home purchasers, either insured by the Federal Housing Administration (FHA), or guaranteed by the Veterans Administration (VA). In each instance the commitment was well in excess of a half million dollars ($500,000).

Subsequent to the passage of the Act, each mortgage loan broker notified the developers that they could not honor their original financing commitment because of the ambiguity created by the Act with regard to the legal rate of interest, the computation of points and uncertainty regarding the judicial interpretation which might be given to certain fees and charges set forth in the Act and normally paid by the borrower or seller and at times retained by the lender. The purpose of the plaintiffs in the action below was to seek clarification of provisions of the Act, so that the loan commitments made on the part of the mortgage brokers might be specifically enforced by the developers. After answers were filed by the defendants the cases were consolidated in the court below and the Attorney General was permitted to intervene on behalf of the State of Maryland.

This Court is somewhat hard pressed to discern in these proceedings a justiciable matter because all parties are corporate entities whose common gravamen is the possibility of unwitting exposure to penalties attached to usurious interest as provided by § 3 of the Act. It was thought that Art. 23 § 125 of the Code (1967 Repl. Vol.) which provides "No corporation shall interpose the defense of usury in any action," provided an escape hatch which would exculpate the corporate plaintiffs from any usurious conduct and thus render the question of usury moot. However, we do acknowledge a valid question regarding the applicability of the disclosure provisions of the Act, commonly referred to as the "Truth in Lending" provision, found in Section 10, as the same may relate to the parties to this action and their transactions. We are also aware that the home mortgage financing ultimately contemplated by the par-

ties, and the purpose for which they have entered into a commitment agreement, would involve, in practically every instance, individual residential property owners to which transactions the provisions in the Act pertaining to usury, as well as disclosure, would be applicable. We therefore are of the opinion that we have a justiciable matter before us.

At the beginning of the 1968 Session of the General Assembly of Maryland, the Legislature addressed itself to the crisis precipitated by the demand for higher interest rates for home financing, induced by a tight money market, juxtaposed against Maryland's Usury Law (Code Art. 49, § 1) which established the maximum legal rate of interest at six per cent (6%).

To alleviate the situation, House Bill No. 11 was introduced which permitted the lender and borrower to agree to an interest rate not to exceed a legal maximum of eight per cent (8%). However, the Act coupled the raise in interest rates with certain restrictive provisions designed to regulate unscrupulous lenders, and by § 2(A) specifically prohibited the practice of charging "points," except for business or commercial borrowers of more than $5,000 and in the case of "* * * any loan guaranteed or insured by FHA, VA or any other instrumentality of the Federal Government where the maximum interest rate is not more than 7%; * * *." The Act also contained a "truth in lending" provision which required that certain disclosures be made by the lender to the borrower.

Long before the Governor's imprimatur was on the Act, home mortgage brokers were posing, not the metaphysical question of "how many angels may be balanced on the point of a needle," but the very mundane question of how many "points" may be charged at the inception of the loan while keeping the transaction within the framework of the legal maximum interest rate of eight per cent (8%). If for example, in the case of $10,000 mortgage loan, bearing interest at six per cent (6%) per annum, payable over a 20 year term, a fee of five "points" were to be charged at the inception of the loan and the "points" were to be construed as interest payable during the initial year of the loan, the interest rate for the first year would be eleven per cent (11%) and obviously usurious. On the other hand, if the five "points" were to be computed or spread over the twenty

year life of the loan it would come within the permissive rate of the Act, as we shall later illustrate.

The legal acceptance of the spreading of "points" was the main issue presented to the court below and argued on appeal, however, the "truth in lending" or disclosure provisions of the Act, as well as the treatment to be given other items of expense attendant to the consummation of a mortgage financed real estate transaction, were challenged for ambiguity.

The consternation within the home mortgage market created by the possible legal construction which might be placed on various provisions of the Act, wrought little short of havoc.[1]

For the sake of clarity our discussion of the Act will be divided into four categories: (1) the proper method for computing interest in determining if a given loan is usurious; (2) the treatment to be given interest when the loan is prepaid; (3) the nonapplicability of the disclosure provisions of the Act to commercial loans in excess of $5,000 and the manner in which disclosure regarding the interest in construction loans may be met; (4) which of the many items involved in the settlement of a loan are required to be considered as interest and which are not.

The lower court in an able opinion by POWERS, J., specifically delineated answers to the problems encountered under the above categories with the exception of that of prepayment of the loan, under category 2. The primary question before the court below was the manner in which interest should be computed and we agree with its concept of the spreading of "points" over the

---

1. POWERS, J. in the opinion of the lower court described the disruptive influence caused by the passage of the Act on the mortgage loan market in the following graphic language:

"While accomplishing the important purpose of increasing the maximum legal rate of interest to 8%, the Act was not received by those concerned as a model of clarity or simplicity nor was there complete unanimity in the interpretation of its many provisions. Most out of state sources of substantial funds, including Federal National Mortgage Association, became unavailable, stagnation of the home building business was threatened, and many wondered if the Act would accomplish the purpose for which it was intended."

life of the loan in computing the effective interest rate. We further agree with the court's treatment of expenses collected by the lender at the time of the consummation of the transaction and its designation as to which items should or should not be construed as interest. However, we disagree with the court's conclusion that the disclosure provisions of the Act were intended to be applicable to commercial loans in excess of $5,000. We shall discuss all categories seriatim.

I

All parties agree that the most troublesome problem raised by the Act is the manner in which "points" should be treated in context with the term "interest," "stated interest" and "effective rate of simple interest," all terms used rather inartistically, in various sections of the Act. To fully understand this problem a brief discussion of the anomalous term "points" should be helpful.

Our search reveals that there is no mysterious connotation to the word "point." It simply denotes a fee or charge equal to one per cent (1%) of the principal amount of the loan which is collected by the lender at the time the loan is made. It may be used interchangeably with the term "bonus," "premium," "loan origination fee" or "service charge." The basic tenent to remember is that it is a fee or charge which is collected only once, at the inception of the loan, and is in addition to the constant long term stated interest rate on the face of the loan.

This Court discussed the question of a "bonus" in *Birmingham v. Maryland Land and Homestead Association*, 45 Md. 541 (1876) and again we find the use of the term "premium" in *Washington National Building and Loan Association v. Andrews*, 95 Md. 696, 53 A. 573 (1902). Mr. James D. Laudeman, Jr., Chairman of the Legislative Coordinating Committee of the Savings and Loan Industry in Maryland, a member of the American Bar Association Committee on Real Estate, Probate and Trust Law and a member of the Governor's Study Commission on Interest and Usury Laws, testified as an expert witness on the custom and usage of "points" in the home mortgage finance industry in Maryland. He emphasized the acceleration given to the practice of exacting points since the

advent of the FHA and VA programs to the extent that today it is a term given universal acceptance in the lending industry throughout the country.[2]

One theory advanced in justification for charging "points" is the recoupment of the administrative or operating costs attendant to negotiating the loan. See 91 A. L. R. 2d 1392 *Anno: Usury-Procuring Money Loaned-Expense* § 3.

To bring into focus the tolerance allowable for "points" within the framework of the eight per cent (8%) legal maximum interest rate permitted by the Act, when dealing with FHA or

---

2. Excerpts from testimony of James D. Laudeman, Jr.: "With the introduction of the FHA and VA programs, however, the amount of the points or the amount of the premium that was paid rapidly became standardized at one per cent of the amount of the loan because the regulations issued by the two agencies both expressly allowed the lender to collect and the borrower to pay an amount equal to one per cent of the amount of the loan. VA Regulations, Section 36:4312, subsection (d), part I B, and FHA Regulations, Section 203.27, subsection (a) (2).

"Since the late 1940's the term 'point' has been a term of general usage in the mortgage lending industry to describe a fee or charge of one per cent of the amount of the loan collected at the time the loan is made but it was not until the Virginia Legislature early in 1968 enacted Section 6.1-319 of the Code of Virginia that the word had any legislative definition.

" * * * 'For the purpose of this section the term points is defined as the amount of money, or other consideration, received by the lender, from whatever source, as a consideration for making the loan and not otherwise expressly permitted by the statute.'

"So Virginia defined the term 'point' in putting it into their act.

"The Maryland Legislature then enacted House Bill 11 which makes several references to the word 'point' thus indicating that the term was intended to have the meaning generally associated with it in the industry.

"On May 29, 1968, the President of the United States signed Public Law 90-321, the 1968 Consumer Protection Act. Section 106 of that Act, in defining the term 'Finance Charge,' states that it consists of 'interest, time price differential, and any amount payable under a point, discount, or other system of additional charges."

VA guaranteed or insured loans or those insured by any other instrumentality of the Federal Government as provided by § 2(A), we can employ no better example than that used by the lower court to illustrate both the problem and the answer.

Let us assume that the borrower has applied for a loan of $10,000 bearing interest at the rate of six per cent (6%), with the interest and unpaid balance being paid in fixed monthly installments over a period of twenty (20) years, with a charge of five "points" being deducted by the lender. This $10,000 loan with five "points" charged results in a five per cent (5%) discount applied to the principal sum and yields a $9,500 net loan to the borrower.[3]

The borrower who thus receives a net of $9,500 after deducting five "points" and pays back $10,000, plus interest, in monthly installments over twenty (20) years is not paying the $500 deducted from the face amount of the loan in the first year but is paying a small portion of this each month over the entire twenty (20) years.

The determinative factor as to whether or not the interest in such a case is usurious is the annual effective rate of interest (not to be confused with the term "stated interest"). If the annual effective rate of interest does not exceed eight per cent (8%) then it is not usurious and this annual effective rate of interest is computed as follows, again borrowing the example used by the court below:

> "The dollar amount of interest payable during the life of the loan is ascertained by multiplying the amount of each monthly payment by the number of months and subtracting the net principal of the loan. Hence, in the case of a $10,000 loan at six per cent (6%)

---

**3.** Section 2B of the Act: "In the event that charges or fees which, under this Article are deemed interest, are assessed at the inception of the contract of indebtedness, the rate of interest required in Section 10 of this Article shall be determined in the same manner as if fees and charges had not been assessed except that the principal of the loan used in determining the rate of interest shall be the face value of the loan less any fees or charges which are interest."

with five points deducted, payable over 20 years, with the fixed monthly payment of $71.65:

$71.65 X 240 (20 years X 12 mos.) = ....... $17,196.00 total paid by borrower

Less net loan after subtracting points deducted ............................... 9,500.00

Total dollar amount of interest paid for the use of $9,500.00 during life of loan ........... 7,696.00

The stated rate of interest in the note itself is ... 6%

The current yield to the lender, who receives interest at the rate of $600.00 per year for a $9,500.00 loan, is $9,500.00 divided into $600.00= ... 6.31%

But because the lender not only receives a current yield of 6.31% but during the life of the loan also receives back the $500.00 deducted from the face amount of the loan, he has a yield to maturity of ... 6.65%" [4]

(6.65% being the annual effective rate of interest)

The 6.65% annual yield to maturity set forth in the above example is the annual effective rate of interest and is not usurious.[5] Adopting the validity of the above illustration this Court concludes that the charge of a fee, commonly called "points" made at the inception of the loan, should not be considered interest paid in the initial year of the loan but is to be computed or spread over the term of the loan.

Although the Act manifests legislative hostility to the charging of points, as may be deduced from § 2(A), yet the language of § 2(B) expresses an expectation of the usage of points with regard to the FHA, VA and other federally insured or guaranteed loans. We do not think it was the intent of the Legislature that Maryland should be different from other jurisdictions, where such charges made at the inception of the loan, are not

4. Yield figure obtained from "Prepayment Mortgage Yield Table for Monthly Payment Mortgages," Sec. Ed., p. 338.

5. Were the 5 points to have been construed as interest during the initial year of the loan the transaction would be usurious as the interest during the first year would have been 11%.

construed as usurious when the amount obtained plus the interest actually charged spread over the life of the loan is less than the legal maximum interest. 57 A. L. R. 2d 649 *Anno: Usury-Interest In Advance* § 6. We think that the Legislature, although eliminating "points" with regard to conventional home mortgage loans, (§ 2(A)), did not intend to eliminate them with regard to FHA and VA loans, or other loans guaranteed by an instrumentality of the federal government where the maximum interest rate was not more than seven per cent (7%), but rather to regulate them. (§ 2(B)).

We think this Court also should attempt to resolve any ambiguities occasioned by the usage in various sections of the Act of the term "interest" (§ 1(A)), "simple interest" (§ 3) "effective rate of simple interest" (§ 10(a) (2)), and "stated rate" (§ 8 (2)) and their interrelation with each other.

"Interest" is defined in § 1(A) of the Act as follows:

"(A) The term interest as used in this Article means any compensation imposed directly or indirectly by a lender for the extension of credit for the use or forbearance of money, including but not limited to loan fees, service and carrying charges, discounts, interest, time-price differentials, investigators' fees and any amount payable under a point, discount, orgination fee or other system of additional services except as specifically provided in this section. * * *"

"Simple interest" is that paid on the principal lent as distinguished from compound interest which is interest paid on unpaid interest. See 47 CJS 11, § 1. The "effective rate of simple interest," as we have already stated, refers to the yield to maturity rate received by the lender after deducting any premium, discount or points. We think that the Legislature intended that this "effective rate" should be the rate recited in the disclosure statement which the lender must furnish to the borrower pursuant to § 10(a) (2).

Section 3 of the Act which provides that the interest rate, by written agreement between the borrower and the lender, may be

as high as eight per cent (8%) per annum simple interest on the unpaid balance requires that:

> "* * * This agreement must set out the annual rate of interest which is charged, stated in percentage and be a separate instrument from the contract of indebtedness * * *."

It is our interpretation of the language used in § 3 that it was the intent of the Legislature that the rate of interest set forth in the agreement required by § 3 should be the rate of interest which appears on the face of the mortgage and mortgage note, if the latter is used. This would be the stated rate of interest. See also § 8(2). Referring to the example previously used in this opinion, it would be the six per cent (6%) item illustrated therein. Again, we emphasize that the test as to whether the loan is usurious would be the amount of the effective annual interest rate (yield to maturity) which in our example is 6.65%. This latter figure, as we have already stated, should appear in the disclosure statement.

Any discussion regarding the proper computation of interest and the treatment of "points" in relation to the rate would be incomplete without a clarification regarding "points" which are charged to the seller. We think that § 2(A) adequately covers this question and that it makes no difference whether the "points" are to be collected from the seller or the borrower insofar as their being included within the computation of the interest rate is concerned. The pertinent language in § 2(A) states "a charge or fee commonly called 'points' or mortgage origination fee, and *extracted by a lender from either the borrower or any other person* as additional compensation for the loan of money * * *." (Emphasis supplied.); obviously, the seller in any transaction comes within the definition of "any other person." The fact that § 2(A) specifically prohibits such charges with regard to conventional loans, that is, loans other than FHA, VA or those guaranteed by other federal instrumentalities where the maximum rate is not over seven per cent (7%), leaves but one conclusion and that is that points were to be permitted with regard to those loans guaranteed by FHA, VA or other federal instrumentalities and that "points" col-

lected from the seller must be incorporated in the computation of the interest rate. See Opinion of the Attorney General, June 7, 1968 (Daily Record June 18, 1968).

## II

The question of the manner in which interest should be treated under the Act when the prepayment of the loan occurs was not pressed in the court below nor did the court discuss it in its opinion, however, we think it germane to the issues presented on this appeal. The problem which arises is that prepayment of the loan has the effect of increasing the interest yield to the lender and accordingly, depending upon the construction adopted, may render the loan usurious.

It must be remembered that the loan agreement between the lender and the borrower is prospective in its operation and it is reasonable to anticipate that there will be compliance with its terms. We are of the opinion that where the annual effective interest rate is within the legal rate of interest, there can be no question but that the lender is entitled to accept prepayment of all the outstanding principal without rebate. Such actually would be the case in the event of foreclosure of the mortgage lien. In cases where the loan contract provides for prepayment of the loan at the election of the borrower (FHA and VA mortgages provide for such an election) should the borrower exercise this option to prepay the loan and such action in fact renders the effective interest rate greater than eight per cent (8%), the transaction is not usurious as long as the interim payments of the effective interest rate would have been legal in contemplation of continued payments to the maturity specified in the contract. 55 Am. Jur. 360, *Usury*, Sec. 48; 75 A. L. R. 2d 1265; 130 A. L. R. 73; 100 A. L. R. 1431; 84 A. L. R. 1283. See Opinion of the Attorney General, July 11, 1968 (Daily Record, October 1, 1968).

It would appear that the Legislature recognized the possibility of prepayment of the loan and intended that this could be accepted without requiring a rebate on the part of the lender. Section 1(B) (2) specifically provides that the collection of a prepayment penalty be allowed, where such is provided in the original loan contract, during the first three years of a loan se-

cured by certain types of property, including homes, and prohibits prepayment penalties thereafter. Section 1(B) (2) is silent as to any rebate requirements in the event of prepayment; this gains significance by contrast with § 5(a) wherein it is specifically provided, in case of loans not secured by real property, that rebate be made of any excess interest, by way of refund to the borrower or by a credit to his account, should an excess occur by reason of prepayment of a loan prior to maturity.

## III

The question as to legislative intent regarding the application of the disclosure or "truth in lending" provision of the Act, § 10 raises two issues of general concern to the mortgage industry: (a) whether the disclosure provisions of § 10 apply to commercial loans in excess of $5,000; and (b) the difficulty of accurate disclosure of interest in construction loans.

## (a)

Section 7 of the Act specifically exempts from the disclosure provisions required by § 10 any loan in excess of $5,000 made "* * * to any business or commercial organization or to a person or persons owning or desiring to acquire a business as a sole proprietor or joint venture, if the loan is transacted solely for the purpose of carrying on or acquiring a business or commercial investment, * * *." The lower court is of the opinion that although § 7 exempted the commercial loans described therein from the provisions regarding usury, that nonetheless commercial transactions were subject to the disclosure provisions set forth in § 10 of the Act. We disagree with the lower court's interpretation.

In order to divine the legislative intent behind the disclosure provisions of § 10, it is necessary to consider the primary objective sought to be achieved by the Act, which was to provide protection for the home buyer from sharp practices of some lenders. The entire rationale of the Act is predicated on the recognition of the naivete of laymen who do not engage in a sufficient number of mortgage transactions to acquire any degree of expertise and whose exposure is oft-times limited to a once in a lifetime mortgage contract. Clearly, protection for the vast majority of the public who fall into this category is needed

and can best be achieved by the disclosure statement required by § 10, which puts them on notice as to the rate and amount of interest they will pay, as well as other charges incident to the closing of the transaction, prior to the execution of the contract of indebtedness.

On the other hand the borrower for commercial purposes usually possesses a degree of sophistication regarding the practices of the market place and is prompted to make his deal where money is cheapest.

We think the lower court was overly impressed by the evidence concerning an earlier draft of § 10(a) of the Act which contained provisions requiring a written statement setting forth certain information and which excluded business and commercial loans from its application, and from which draft the words accomplishing the exclusion were ultimately stricken by amendment. The lower court concluded that the deletion of the words of exclusion indicated a legislative intent to subject commercial loans to the disclosure provision. We, however, are of the opinion that the reason the words exempting commercial loans from the disclosure provisions were stricken from the earlier draft of § 10, was for the reason that they constituted excess verbiage. The answer is simple, why should specific language be needed in § 10 to exclude commercial loans from the application of its disclosure provisions when such loans had already been excluded from the operation of the Act by § 7. We think § 7 goes that far and that it was the legislative intent that § 7 should have a broad effect. Section 7 commences with the clear introductory clause that reads: "7. Notwithstanding the other provisions of this article," and then proceeds to exclude commercial loans in excess of $5,000.

It is true that the main thrust of § 7 is to cover the usury provisions of the Act; however, we think that the disclosure provisions of § 10 were included in the Act to fortify the control over interest sought to be achieved by § 7, ergo, since commercial loans in excess of $5,000 are exempted from the usury regulations in § 7 there would be little or no practical benefit derived from subjecting such loans to the disclosure provisions of § 10, and we do not think the legislature intended such an exercise in futility.

We think the reading of the statute as a whole supports our conclusion regarding the nonapplication of the disclosure provisions to commercial loans exempted by § 7. We are not unmindful that this technique has frequently been employed by this Court.

> " 'In ascertaining the intention of the legislature, all parts of a statute are to be read together to find the intention as to any one part, and all parts are to be reconciled and harmonized if possible.' " *McConihe v. Comptroller,* 246 Md. 271, 275, 228 A. 2d 432, 434 (1967), and cases cited therein."

### (b)

In the case of construction loans, the industry shies away from the requirement in the disclosure provision of § 10(a) (2) which provides that the interest rate be "stated in percentage calculated to the nearest 2/10 of 1%." The mortgage brokers contend that a construction loan is a hybrid transaction providing for the release of mortgage money in stages as the construction advances and that both principal and interest are frequently subject to final adjustment. It is argued that the nature of the loan renders a precise determination of interest inordinately difficult, if not impossible, at the time the contract of indebtedness is executed. Not wanting to be accused of financial legerdemain, the lenders have asked for guidance which will give legal sanction to some elasticity in this area. In the lower court, Powers, J., was of the opinion that there would be compliance with the disclosure provisions of § 10, if the lender set forth in the disclosure statement the "maximum amount of interest 'to be collected' as anticipated under the contract of indebtedness as of the date of its execution, * * *."

We find the lower court's construction to be a practical and sensible solution to a problem which the lenders may have overendowed with technicalities. One of the cardinal rules of statutory construction is that wherever possible an interpretation should be given to the statutory language which will not lead to oppressive, absurd or unjust consequences. *Kolb v. Burkhardt,* 148 Md. 539, 129 A. 670 (1925) ; *Bouse v. Hutzler,* 180 Md. 682, 26 A. 2d 767 (1942) ; *Rogan v. Baltimore & O. R. Co.,* 188 Md. 44, 52 A. 2d 261 (1947).

## IV

Subsections 1(B) (1) through §§ 1(B) (5) of § 1(B) of the Act enumerate those charges which may be imposed by the lender and which by the express language of the Act are removed from the definition of interest. Subsection 1(B) (6) represents an attempt to set forth and limit actual legitimate expenses that have no relation to any compensation paid to the lender, and although §§ 1(B) (6) provides that any other expenses (than those listed in §§ 1(B) (6)) shall be considered interest, it must be construed as meaning that any other expenses other than those specifically enumerated and excluded from being interpreted as interest, in §§ 1(B) (1) through 1(B) (5), shall be considered as interest. In other words § 1(B) (6) must be read in harmony with §§ 1(B) (1) through 1(B) (5) and not as qualifying the items exempted from interest therein. *McConihe v. Comptroller,* 246 Md. 271, 275, 228 A.2d 432, 434 (1967).

The parties to this action entered into a stipulation in the lower court, setting forth the various charges and fees collected by the lender and the manner in which they were customarily treated prior to the effective date of the Act. The court below elaborated in detail on each item set forth in the stipulation and the construction which should be given them when viewed in light of the charges and fees enumerated in §§ 1(B) (1) through 1(B) (6) of the Act. We think it did so with sufficient clarity to enable the parties to ascertain, by virtue of the guidelines given, whether a specific item set forth in the stipulation should, or should not, be included in the computation of interest. We adopt the lower court's classification of specific items as set forth in its order, with what we hope to be appropriate comment, by way of supplemental explanation. The main thrust of the lower court's rationale is that the determining factor, in the event of any ambiguity as to whether or not a fee or charge should be included as interest, is whether such charge is retained by the lender and, if so, it should be treated as interest. That such a construction is a projection of the intent of the Legislature becomes manifest upon reading the Act. The lower court in the following portion of its opinion expressed it well:

"All of the charges customarily made at the time of settlement and not retained by the lender appear to come within either § 1(B) (3), § 1(B) (4) or § (B) (6).

Conversely any charge retained by the lender is suspect and therefore deemed interest. A significant test is determining whether charges made to the borrower are to be deemed interest is whether or not they are retained by the lender. The intent obviously was that it is through 'padded' charges made by an unscrupulous lender that additional compensation for the use of the money could be realized."

The interest rates and points to be charged by the three appellants were as follows: B. F. Saul Company, 6½% interest per annum and 5 points (1 point to be paid by the purchaser and 4 points by the seller), term of the loan 30 years; Frederick W. Berens, Inc., 6¾% interest per annum and 7½ points (1 point to be paid by purchaser and 6½ by seller), term of the loan 30 years; Weaver Bros., Inc., 6¾% interest per annum and 7 points (1 point to be paid by the purchaser and 6 points by the seller); all lenders intended to spread the points over the term of the loan. The lower court in the first four paragraphs of its decree found that an actual controversy exists and that in all three instances the commitment of the lenders (appellants) does not violate the interest and usury provisions of Chapter 453 of the Laws of 1968 of the General Assembly (House Bill No. 11).

The court proceeded in its decree to classify the various fees and charges itemized in the stipulation and the other issues raised by the parties. A proper understanding of what the lower court ordered in its decree and those portions of it with which we agree, requires us to set forth the remaining portion of the decree verbatim:

"5. That under Chapter 453 of the Laws of Maryland, 1968, the charge of a fee commonly called 'points' together with other charges which are considered as interest under the Act and which points and charges are made at the outset of the transaction should be

computed as interest over the term of the loan even though paid in the initial year of the loan.

6. That the interest rate to be stated in the agreement required in § 3 and the effective rate of simple interest to be stated as required by § 10(a) (2) is to be based on the full amount paid by the borrower for the use of the money.

7. That § 10 of Chapter 453 requires that the disclosure statement be furnished to borrowers in business or commercial transactions concluded under § 7 of said chapter.

8. That the provisions of § 10 apply to a construction loan when the length of time and dates of funding parts of the loan must await subsequent developments, and all that is required of the lender is to furnish the information on the basis of the provisions of the loan agreement as written, without responsibility to anticipate the various contingencies which might arise.

9. That § 1(B) (6) and the other provisions of § 1(B) are not in conflict but that the terms 'actual expenses collected by the lender are specifically enumerated in this section' as set forth in § 1(B) (6) includes those enumerated in § 1(B) (1) through § 1-(B) (5).

10. That generally any charge made by a lender in connection with the loan, even though for one of the classes of expenses enumerated in § 1(B) (6), if retained by the lender constitutes interest under the Act.

11. That with specific reference to the items of expense before the Court in the present cases:

The cost of a Credit report not retained by the lender and required by FHA and VA loan procedures is within the terms of § 1(B) (6) (C) as a cost for insuring the lender 'against loss or liability on or in connection with the loan.'

The cost for Appraisal fees required by FHA and VA loan procedures is exempt from the calculation of interest under § 1(B) (3) and in other cases under

§ 1(B) (6) (C) provided the charge is not retained by the lender.

Title examination fees are not interest under § 1(B) (6) (C) provided the same are not retained by the lender.

Charges for preparation of deed of trust and note and title insurance charges not retained by the lender but paid to the persons furnishing the services and insurance are not interest under § 1(B) (6) (C).

Charges for recording the deed of trust and the recordation tax are paid to the Clerk of the Circuit Court under requirements of law and are not interest under § 1(B) (3).

Tax assessor's fee is a cost of acquiring the certificate as to the status of real estate taxes on the security property. It is a necessary expense and paid to a governmental agency and is not interest under § 1(B) (3).

Notary fee is a charge imposed by a public officer for the required acknowledgment of legal documents and is not interest under § 1(B) (6) (C).

Sums charged and retained in escrow by the lender on account of future taxes are held for the account of the borrower and are not to be considered interest.

Charges for fire insurance premiums, life or health insurance premiums and monthly payments to escrow accounts and renewals thereof, provided that such charges are actually paid to the insurer and are not retained by the lender, except during the period of any escrow accrual, are not interest.

Charges collected for FHA insurance premiums are collected at the direction of FHA, a governmental agency and constitute premiums for insuring or indemnifying the lender. They are not to be considered interest under either § 1(B) (3) or § 1(B) (6) (C).

Charges for the cost of a survey are necessary to securing an unqualified title certificate or title insurance policy and are not interest under § 1(B) (6) (C) when paid to the surveyor.

Charges for VA inspection fee and VA funding fee are requisite to the securing of a VA guarantee and are not interest under § 1(B) (6) (C); * * *."

The only portions of the decree with which we disagree are paragraph No. 7, wherein the court states that the disclosure provisions of § 10 of the Act applies to commercial loans in excess of $5,000 (§ 7) and that portion of paragraph No. 6 relating to the manner in which interest shall be set forth in the loan agreement. For reasons stated in some detail elsewhere in this opinion we reverse those portions of the decree.

We should like to point out that the stipulation of the parties reveals that with regard to some items of cost the lender retains all or a portion of the fee. This practice should be modified to comply with the guidelines furnished by the court, should the lender desire that such charges not be computed as interest.

The FHA retains all of the appraisal fee and since this is a governmental agency this fee is specifically excluded from interest by virtue of § 1(B) (3). However, VA appraisals are not paid to the VA and in the case of Frederick W. Berens, Inc. and B. F. Saul Company, are retained by them as the appraisal is done by a staff appraiser on the lenders' payroll. In such a case the appraisal fee would be computed as interest.

Weaver Bros., Inc., on occasion does its own title work through house counsel and retains the fee. In such an instance this charge should be included in the interest. Also, a salaried house counsel of Weaver Bros., Inc., receives the fee for preparation of the deed of trust and note. Although the house counsel's salary is unrelated to the fees which he retains, since he is an employee of the lender, we construe this practice as retention by the lender and it should be construed as interest.[6]

---

6. We do not wish to further complicate this opinion by commenting on the question of the propriety of such an arrangement whereby lender's house counsel is paid for title work and preparation of instruments where the charge is made to the borrower, however, reference is made to § 47 of the "Canons of Professional Ethics of the American Bar Association" and the provisions regarding unauthorized practice of law found in Code Art. 27, § 14 (1967 Repl. Vol.)

Weaver Bros., Inc., and B. F. Saul Company are also licensed insurance brokers and retain a commission on fire insurance. Under such a practice the commission should be treated as interest.

All appellants in their role as lenders receive the benefit of life insurance commissions on some contracts, however, there is no requirement that the borrower obtain life insurance through any institutions made available by the lender. When commissions are actually retained by the lender such a commission should be included as interest.

For the reasons stated in this opinion the decree of the lower court is affirmed with the exception of paragraph No. 7, holding the disclosure provisions set forth in § 10 applicable to commercial transactions concluded under § 7 of the Act and that portion of paragraph No. 6 as to the manner in which interest should be stated in the loan agreement.

> *Decree affirmed in part, reversed in part and case remanded for the entry of a decree in accordance with this opinion: appellants and appellees to share costs equally.*