PAN AMERICAN SULPHUR COMPANY, ET AL.
*v.* STATE DEPARTMENT OF ASSESS-
MENTS AND TAXATION

[No. 393, September Term, 1967.]

*Decided December 6, 1968.*

*Motion for rehearing filed January 3, 1969; denied January 7, 1969.*

The cause was argued before HAMMOND, C. J., and MAR-BURY, BARNES, FINAN, SINGLEY and SMITH, JJ.

*Russell R. Reno, Jr.,* with whom were *J. Crossan Cooper, Jr.,* and *Stuart H. Rome* on the brief, for appellants.

*Jon F. Oster, Assistant Attorney General,* with whom was *Francis B. Burch, Attorney General,* on the brief, for appellee.

FINAN, J., delivered the opinion of the Court. MARBURY and BARNES, JJ. dissent. Dissenting opinion by BARNES, J. (See p. 629, *infra*).

This case involves three appeals, one by Pan American Sulphur Company and two by Pan American Sales Company (collectively referred to as Pan Am), from an order of Judge Joseph L. Carter of the Baltimore City Court affirming a decision of the Maryland Tax Court. The effect of the order was to deny to the appellants the benefit of the Maryland and Baltimore City manufacturer's exemptions from personal property taxation for a liquid sulphur storage facility located in Baltimore City. The tax years and assessments involved are 1963 in the amount of $432,410.00, 1964 in the amount of $384,-360.00 and 1965 in the amount of $363,320.00.

The parties submitted an agreed statement of facts of which the following is a summary.

Pan Am, a Delaware Corporation, having its principal office in Houston, Texas, has for many years engaged in the business of sulphur exploration, sulphur mining and the sale of sulphur. The main source of supply is located in Mexico. This sulphur which is located in underground "sulphur domes" is pumped to the surface in a heated liquid state. Until recently it would be allowed to cool and harden and then be shipped to various customers. These customers or purchasers would then usually reheat the sulphur and convert it into a liquid state to be useable in their business.

Because of technological advances, it became feasible to maintain the sulphur in its heated, liquid state and to ship it and store it in this same heated, liquid state. After transportation in ships containing heated cargo tanks, the sulphur is stored in heated tanks at or near its ultimate destination. Such a heated storage facility was built in Baltimore by the appellant on land leased to that company by the Baugh Chemical Company (which is now known as Kerr-McGee Chemical Corporation). Kerr-McGee Chemical Corporation is a large user of liquid

sulphur and purchases a great quantity of it from the appellant. The liquid sulphur is converted into sulphuric acid which is then used by Kerr-McGee in the manufacture of fertilizer. The American Agricultural Chemical Company (AACC) located on land adjacent to the land leased from Kerr-McGee by the appellants, is also a user of liquid sulphur and draws from the supply stored in the tanks on the property of Kerr-McGee and also has certain of the components of the distribution system located on its own property. It is this heated storage facility which is the subject of the three tax assessments currently under protest.

The facility consists of two large heated tanks, which are specially constructed so that the contents can be maintained at the requisite temperature of 270 degrees Fahrenheit. The liquid sulphur is pumped from the heated vessel by the vessel's pumping apparatus to these two large storage tanks. There is a pipe running from the Clinton Street dock of Kerr-McGee to the liquid sulphur storage tanks approximately 500 feet away, located on land leased from Kerr-McGee. There are then two blister pipes running from the storage tanks to the fertilizer manufacturing plant of Kerr-McGee and the AACC which carry the sulphur at the required temperature of 270 degrees Fahrenheit.

The two large storage tanks, the pipe line from the dock to the tanks, and the feeder lines from the tanks to each plant are owned by Pan Am. The steam boiler furnace, and oil storage tanks, which are part of the steam producing system necessary to maintain temperature, are likewise owned by Pan Am. There are also two reservoir tanks on the property which are owned by Pan American.

Although the furnace, steam boiler, and oil tanks, as stated above, are the property of Pan Am, they are within the Kerr-McGee plant and are operated and maintained by Kerr-McGee.

Approximately 38,000 tons of liquid sulphur are imported and stored in the large liquid sulphur storage tanks each year. In the neighborhood of 7,500 tons of liquid sulphur are drawn from these and utilized each year by AACC. The balance of approximately 30,500 tons is consumed each year by Kerr-McGee.

Sulphur in the tanks is the property of Pan Am which company has the right to sell the sulphur to any user. On at least one occasion, Pan Am sold to another company liquid sulphur which was delivered by Pan Am out of the tanks located on the Kerr-McGee property.

The arrangements in connection with the establishment and maintenance of these sulphur facilities are contained in a "Lease and Operating Agreement" between Pan Am and Kerr-McGee (then known as the Baugh Chemical Company), and an "Agreement for Molten Sulphur Facilities" between Pan Am and AACC.

Under the terms of the agreement with Kerr-McGee, Pan Am leases the tract of land of approximately 15,000 square feet used for the facility. Kerr-McGee superintends the operation of the storage facilities and is required to pay the costs incidental thereto. For this service, Kerr-McGee is compensated at the rate of $1.25 for every ton of sulphur which is delivered from the storage facility. It is also paid $4,000.00 per year as an annual rent for the land. As a result of this arrangement, Pan Am maintains no personnel in Baltimore to supervise the operation of the storage facility. After ten years, the lease will terminate and the entire storage facility located on Kerr-McGee property will become the property of Kerr-McGee.

A similar arrangement exists with AACC. Title to the two small reservoir tanks located on their land is in Pan Am, while responsibility for their maintenance, operation, repair, and replacement is with AACC. After the expiration of 20 years or upon the consumption of 1,000,000 tons of liquid sulphur, title to these reservoir tanks passes to AACC.

Pan Am bases its claim for exemption of the facility from taxation on the fact that it is used entirely or primarily in connection with manufacturing in Baltimore City and thus, is exempt under the provisions of Ordinance No. 1340 (Ordinances and Resolutions of the Mayor and City Council of Baltimore 1957-1958 approved April 7, 1958, effective December 31, 1958), and Section 9 (23) of Article 81 of the Maryland Code, which exempt from city and state personal property taxation property "used" in manufacturing.

The pertinent and essential portions of the ordinance are:

"In order to encourage the growth and development of manufacturing industries in Baltimore City and thereby promote the general welfare of the inhabitants of said City, all personal property of every description used entirely or chiefly in connection with manufacturing in Baltimore City, including * * * mechanical tools or implements, whether worked by hand or steam or other motive power, machinery, manufacturing apparatus or engines, raw material on hand, and manufactured products in the hands of the manufacturers, shall be exempt from taxation for all ordinary municipal purposes of the Mayor and City Council of Baltimore * * *."

The exemption from State taxation provided by Code (1965 Repl. Vol.) Art. 81, § 9(23) reads in part as follows:

" * * * Tools (including mechanical tools), implements, whether worked by hand, steam, or other motive power, machinery, manufacturing apparatus, or engines, used in manufacturing * * *."

The appellants contend that the issue in this case is the "use" which is made of the property for which the exemption is sought. If the facility is used for manufacturing, then under the terms of the ordinance and statute it should be exempted from taxation; and ownership of the property, ownership of the land on which it may be installed, and the business or occupation of the taxpayer is immaterial, as long as the property is used in manufacturing. We would agree with this proposition save for one important exception, namely, *that the taxpayer seeking the exemption must be the one using the property for manufacturing purposes,* whether it be by virtue of ownership, by lease or by circumstances set forth in Regulation 8 of the Department of Assessments and Taxation.[1]

---

1. "Reg. 8. Ownership of Personal Property—Where title to personal property is in one person and possession or control of the same in another, as lessee, custodian, consignee, bailee or other-

In the instant case the taxpayer Pan Am, who is seeking the exemption, is not a manufacturer but a supplier. Pan Am describes the facility in the lease as a "sulphur terminal and warehousing facility." The facility for which the exemption is sought does not in any way change the form, shape or character of the product which it receives, from the time it is introduced into the tanks, from the ships berthed at the dock, until it leaves the tanks in the course of its transmission to the plant of the manufacturer. In this respect the facts are distinguishable from *Baltimore v. Tax Commission*, 161 Md. 234, 155 A. 739 (1931), wherein the exempted facility considerably altered the shape of the material which it processed. However, we do not think that in order to sustain our theory of this case it is necessary to distinguish *Baltimore, supra*, in this respect, as there are other basic differences between it and the case at bar. In *Baltimore, supra*, the taxpayer was the one making the claim that it was using the facility for manufacturing purposes, whereas in the instant case Pan Am justifies the exemption on the alleged use of the facility in manufacturing conducted, not by itself, but by customers who purchase the sulphur from it. It should also be kept in mind that Pan Am retains title, not only to the facility but to the product stored in it until it is purchased by the manufacturer, and Pan Am is at complete liberty to sell sulphur to manufacturers other than Kerr-McGee and AACC.

It may be contended that this Court is reading something into subsection (a) of the ordinance which is not there, namely, the requirement that in order to qualify for the exemption the facility must be used for manufacturing purposes by the taxpayer. However, if the ordinance is not so construed, an almost absurd result is reached, to the effect that any supplier or wholesaler supplying a manufacturer with material used in manufacturing could claim a manufacturer's exemption, not only for those surface storage facilities which may qualify as personal property, but also for the material supplied. Certainly

wise, either the title holder or the person in possession or control shall be deemed to be the owner of such property for purposes of ordinary taxation." (Regulations of the Department of Assessments and Taxation, adopted December 18, 1953.)

such a result was not intended by the Legislature. One of the cardinal rules of statutory construction is that wherever possible an interpretation should be given to statutory language which will not lead to absurd consequences. *B. F. Saul Company v. West End Park North, Inc.,* 250 Md. 707, 246 A. 2d 591 (1968) ; *Rogan v. Baltimore & O. R. Co.,* 188 Md. 44, 52 A. 2d 261 (1947) ; *Bouse v. Hutzler,* 180 Md. 682, 26 A. 2d 767 (1942) ; *Kolb v. Burkhardt,* 148 Md. 539, 129 A. 670 (1925).

Furthermore, we think our construction of subsection (a) of the ordinance is supported by the language found in subsection (d) of the ordinance which reads as follows :

> "(d) In case any *person, firm, corporation or other legal entity engaged in manufacturing in Baltimore City shall also be engaged in the business of a jobber or wholesaler,* nothing in this section shall be construed to exempt from taxation the personal property, other than goods of his own manufacture, used in connection with said business of jobber or wholesaler. (Emphasis supplied.)

It should be noted that subsection (d) uses unequivocal language in referring to those "engaged in manufacturing" as the object and purpose of its intendments and continues to explain that even the manufacturer is not to be given special treatment when engaging in the business of a jobber or wholesaler and that property used in connection with the manufacturer's activities as a jobber or wholesaler is not to receive the benefit of the exemption. The language used in subsection (d), which is a corollary to subsection (a) leaves no doubt but that the ordinance is directed toward manufacturers and property used by the manufacturer. This Court has said that "in ascertaining the intention of the legislature, all parts of a statute are to be read together to find the intention as to any one part, and all parts are to be reconciled and harmonized if possible. * * *." *McConihe v. Comptroller,* 246 Md. 271, 275, 228 A. 2d 432, 434 (1967).

Pan Am endeavors to qualify for the exemption by advancing the argument that the facility in question is actually used as

an appendage to Kerr-McGee and AACC, which are manufacturing plants and that the convertible lease agreement it has with Kerr-McGee and its agreement with AACC add up to conditional sales contracts and that the interest of Kerr-McGee and AACC in the respective tanks should be regarded as the equivalent of "almost absolute ownership."

Assuming, without conceding, the validity of this proposition, we do not think it is material to the case at bar. The point we wish to make being, that it is neither Kerr-McGee nor AACC, the manufacturers, against whom the property is assessed; nor did they return the property on their personal property schedule which they filed with the State Department of Assessments and Taxation; nor are they the ones requesting the exemption. The exemption is being requested by Pan Am the supplier. We think this distinction takes this case out of the usual pattern of the manufacturer-lessee or a manufacturer-conditional vendee, wherein the manufacturer-lessee or manufacturer-vendee returns the property on its schedule filed with the Department of Assessments and Taxation on the premise that it has all the indices of ownership, with the exception of title, and requests an exemption. We know in such instances the equipment does qualify for the exemption (Reg. 8, Department of Assessments and Taxation). In such case the one seeking the exemption is the manufacturer-lessee or manufacturer-vendee, who is doing the manufacturing. We do not have such a combination of identities in the case at bar.

Furthermore, we do not think that *Enterprise Fuel Co. v. Jones*, 99 F. 2d 928 (4th Cir. 1948), on which Pan Am relies so heavily is apposite. The question of "use" of the equipment and by whom, was not the pivotal issue in *Enterprise, supra*. That case turned on the questions of title, possession, the recording statute and creditors' rights.

Why Pan Am, Kerr-McGee and AACC hit upon the type of arrangement that they did, is a matter best known to them. They may well have entered into a different type of agreement whereby the facility might have become the first step in a manufacturing process rather than the last step or "tailend" of a selling and distributing process. However, we cannot re-

make their agreements so as to escape the plain language of the ordinance and the statute.

This Court realizes the salutary purpose of the ordinance and the statute which is to encourage and induce the location, growth and development of manufacturing industries in Baltimore City. However, it is a well established rule that tax exemptions must be strictly construed in favor of the state. "* * * If there is a real doubt on the subject, that doubt must be resolved in favor of the state. * * *." *Pittman v. Housing Authority*, 180 Md. 457, 460, 25 A. 2d 466, 468 (1942); "* * * To doubt an exemption is to deny it. * * *." *Suburban, etc. Gas Corp. v. Tawes*, 205 Md. 83, 87, 106 A. 2d 119, 121 (1954).

For the reasons which we have stated in this opinion we find no error in the action of the lower court affirming the decision of the Maryland Tax Court which denied the exemption.

> *Order affirmed, appellants to pay costs.*

Barnes, J., dissenting:

I dissent because in my opinion Ordinance No. 1340 of the Mayor and City Council of Baltimore, approved April 7, 1958 (Ordinance 1340) provides in clear and unambiguous language for the exemption from personal property taxation of the liquid sulphur storage facility in question which is "used entirely or chiefly in connection with manufacturing in Baltimore City." The same facility in my opinion is also exempt from State taxation by the clear and unambiguous provision of Code (1965 Repl. Vol.) Article 81, § 9 (23) as being "used in manufacturing." Pan Am, as I see it, is entitled to the tax exemption for the facility under both statutory provisions.

In considering the factual background, it should be observed that prior to the construction of the facility in 1962, Kerr McGee would unload dry sulphur from the hold of a ship by the use of grab-bucket cranes. These cranes would dump the dry sulphur into hopper cars, which after they were weighed, ran along the main pier trestle to a spur trestle leading to the factory building which housed the sulphur burners. When the

overhead hopper cars arrived in the building, these loads were dumped on to the floor of the building where approximately 5000 tons of dry sulphur could be stored. If the storage area was filled to capacity, the excess dry sulphur would then be stored in the open area within the enclosure where the present sulphur storage tanks are now located. From this open storage area, dry sulphur would be transported to the factory storage area by the use of dump trucks. Workmen using wheelbarrows and hand shovels would then transport the dry sulphur from the storage pile to each of the two sulphuric acid plants where the dry sulphur would be dumped into a bucket elevator which would then transport it into a hopper. Gravity fed lines ran from each hopper to the three sulphur burners comprising the plant and, in this way, a continual supply of dry sulphur to each sulphur burner was assured. When the liquid sulphur storage facility was constructed, the spur line trestle, bucket elevators and gravity fed hoppers were dismantled, but the main trestle and the grab-bucket cranes are still being used by Kerr McGee in the unloading of phosphate rock.

It is thus seen that the importation of sulphur in the liquid form and its transportation to Kerr McGee and to AAC by the use of the liquid sulphur storage facility, resulted in a more efficient operation and a cost saving, primarily by the elimination of the need for man-power in handling the dry sulphur.

It is also important to note that prior to dismantlement, the spur trestle, the bucket elevators and the gravity fed elevators —whose function was replaced by the erection of the liquid sulphur storage facility—were considered by Kerr McGee to be entitled to the manufacturer's exemption and, except during the short period when the manufacturer's exemption was repealed, no tax was paid on them. There is nothing in the record which indicates that the State Department of Assessments and Taxation (the Department) has ever contended that Kerr McGee was not so entitled.

Of importance also is the testimony of John J. Rauh, employed for 20 years by the Department as an assessor of foreign corporations and called as a witness by Pan Am before the Maryland Tax Court. Mr. Rauh is familiar with the policies and the practices of the Department in regard to the manufacturer's

tax exemption in Baltimore City. He testified that raw material storage facilities were, and had been, considered by the Department to be a part of the manufacturing process, stating: "If storage tanks are owned by a corporation engaged in manufacturing, they are exempt by local ordinances as tools and machinery used in manufacturing." He further stated that if the liquid sulphur were owned outright by Kerr McGee and used to supply liquid sulphur to its sulphuric acid manufacturing operation, the Department would afford Kerr McGee the benefit of the manufacturer's tax exemption.

The primary source for determining the legislative intent in a statute is the language used in the statute itself. As we stated in *Maryland Medical Service, Inc. v. Carver,* 238 Md. 466, 477-78, 209 A. 2d 582, 588 (1965) :

> "The cardinal rule of construction of a statute is to discover and to carry out the real legislative intention. *Barnes v. State, ex rel Pinkney,* 236 Md. 564, 574; 204 A. 2d 787, 792 (1962). *Casey Development Corp. v. Montgomery County,* 212 Md. 138, 129 A. 2d 63 (1957). The legislative intent is to be sought in the first instance in the words used in the statute and if there is no ambiguity or obscurity in the language used in the statute, there is usually no need to look elsewhere to ascertain the intent of the legislature. *Board of Supervisors of Election of Baltimore City v. Weiss,* 217 Md. 133, 141 A. 2d 734 (1958). See particularly the comprehensive review of the prior Maryland cases at pages 136 and 137 of 217 Md. If the legislative intent is expressed in clear and unambiguous language, this will be carried into effect by this Court even if this Court might be of the opinion that the policy of the legislation is unwise, or even harsh or unjust, if no constitutional guarantees are impaired by the legislation. *Schmeizl v. Schmeizl,* 186 Md. 371, 46 A. 2d 619 (1946)."

Turning to a consideration of the language used in Ordinance 1340, one finds that in order to encourage the growth and development of manufacturing industries in Baltimore City and

thus promote the general welfare of the City's inhabitants *"all* personal property of *every* description *used entirely or chiefly in connection with manufacturing* in Baltimore City * * * shall be exempt from taxation * * * (emphasis added)."* There is no language indicating that the personal property used in connection with manufacturing *must be owned* by the manufacturer. If this had been intended, the language would doubtless have been "all personal property of every description *owned by the manufacturer* and used entirely or chiefly *by the manufacturer* entirely or chiefly in connection with manufacturing in Baltimore City," etc. The plain fact is that the italicized words *were not used* by the City Council in Ordinance 1340 and it should be assumed that the legislative body had full knowledge of the existing law on the same subject and the absence of these words was deliberate and not inadvertent. See *Maryland-National Capital Park and Planning Comm. v. Silkor Development Corp.,* 246 Md. 516, 524, 229 A. 2d 135, 140 (1967).

The words used in subsection (a) are entirely clear to me and establish the test as "use" and not "ownership" of the personal property. To obtain the tax exemption, it is only necessary under the wording of Ordinance 1340 to establish that the personal property in question was "used entirely or chiefly in connection with manufacturing in Baltimore City," as this is what, in my opinion, the language of the Ordinance plainly states. The language is clear and unambiguous and expresses clearly the legislative intent that the establishment of "use" is the sole element to be established in order to obtain the tax exemption. This being the case, our search for the legislative intent is ended. Our duty is then to carry this legislative intention into effect. We have held that we are not at liberty under the guise of construction to amend or change the legislation before us. As Chief Judge Prescott said, for the Court, in *Amalgamated Cas. Ins. Co. v. Helms,* 239 Md. 529, 535-36, 212 A. 2d 311, 316 (1965) :

> "[T]he courts, in the absence of ambiguity, should, as a general rule, confine themselves to a construction of a statute as written, and not attempt, under the

> guise of construction, to supply omissions or remedy possible defects in the statute, or to insert exceptions not made by the Legislature [citations omitted]."

As I see it, the result of the majority opinion is to add by construction, language which is not present in the Ordinance. This we should not do.

If it be assumed, arguendo, that the language were ambiguous (which I do not think is the case), the legislative intent is also established that *"use,* entirely or chiefly in connection with manufacturing," and not *"ownership* of the personal property" is the test.

First of all, the *general purpose* of the legislation indicates this. We are entitled, in the case of ambiguous language, to consider the general legislative purpose of the legislation to ascertain the meaning of the language. *Cooley v. White Cross Health and Beauty Aid Discount Centers, Inc.,* 229 Md. 343, 350, 183 A. 2d 381, 385-86 (1962). The City Council has aided us in this consideration by plainly stating in subsection (a) the general purpose of the legislation, i.e., "to encourage the growth and development of manufacturing industries in Baltimore City," with its attendant beneficent results of increased employment, greater economic security for the people of the city and the increase of commerce generally in the city. This growth and development is to be aided by the tax exemption so that the uneconomic expense of personal property taxation will not be integrated into the ultimate cost of the manufactured product, thus enabling the manufacturing industry to compete more successfully with competing industries in other political entities which, perhaps, have not had the wisdom and foresight to provide such an exemption. When this general purpose is kept in mind, it seems clear to me that the "use" of *all* personal property of *every* description in the manufacturing process is the important consideration to accomplish the general purpose and "ownership" of that personal property is entirely irrelevant to its accomplishment. Indeed, an additional supposed (but non-existent) requirement of "ownership" of the personal property used in the manufacturing process limits the full *economic purpose intended,* and thereby frustrates, *pro tanto,* the general

purpose. In short, as I see it, the general purpose of the Ordinance is advanced by the literal meaning of the words used; the words, in effect, inserted by construction, frustrate and partially defeat the general purpose.

Secondly, if the words were ambiguous, we are entitled to consider the legislative background or history of the legislation in question. *Baltimore Transit Co. v. Metropolitan Transit Authority*, 232 Md. 509, 513, 194 A. 2d 643, 644-45 (1963).

When the legislative history is considered, it is obvious to me that the choice of language making the "use" in connection with manufacturing the sole test was deliberate. In 1912, the City Council enacted Ordinance No. 140 of the Mayor and City Council of Baltimore, approved July 6, 1912 (Ordinance 140) providing for a manufacturer's exemption, in which the following language was used:

> "[U]pon the application * * * of any individual firm or corporation *actually engaged in the business of manufacturing* articles of commerce *in the City of Baltimore,* to abate any and all personal taxes * * * for *any of the corporate uses thereof,* upon any mechanical tools or implements, * * * or upon any machinery or manufacturing apparatus *owned by such individuals, firm or corporation and* actually employed and *used in the business of manufacturing articles of commerce in the said city;* * * * (emphasis supplied)."

Ordinance 140, which, as indicated, preceded the passage of Ordinance 1340, clearly and without ambiguity established *two* criteria, i.e., (1) *ownership* by the manufacturer in Baltimore City and (2) *use* in the manufacturing process. In view of this legislative background, when the City Council did not use the language requiring ownership, but used only the language requiring use in the manufacturing process, it is clear to me that this choice was deliberate and the City Council did not intend to establish "ownership" as one of the criteria by Ordinance 1340, but did intend to establish "use" in connection with manufacturing as the sole test. In summary, the legislative body did indeed mean what it said.

Thirdly, if the words were ambiguous, we may consider the Ordinance as a whole and other provisions in the Ordinance. *Shreve v. Mayor & City Council of Baltimore,* 243 Md. 613, 619, 222 A. 2d 59, 62 (1966).

The majority states that it finds support for its construction by the provisions of subsection (d) which provides:

> "(d) In case any *person, firm, corporation or other legal entity engaged in manufacturing in Baltimore City shall also be engaged in the business of a jobber or wholesaler,* nothing in this section shall be construed to exempt from taxation the personal property, other than goods of his own manufacture, used in connection with said business of jobber or wholesaler (emphasis supplied in the majority opinion)."

The majority emphasizes the words "engaged in manufacturing," and apparently infers that these words in some way indicate a legislative intent that the language in subsection (a) of Ordinance 1340 "is directed toward manufacturers and property used by the manufacturer." Subsection (d) indicates to me, that the language of subsection (a) means what it states, i.e., "used * * * in connection with manufacturing" and that such "use" is the sole test. Subsection (d) is one of four subsections which follow the general provisions of subsection (a) and which deal with certain special situations— subsection (b) relating to manufactured products held for sale at retail, subsection (c) setting forth the method of establishing the fair average value of inventory, and subsection (e) exempting ores and unrefined metals shipped into the city for processing or refining purposes and metals derived therefrom in the hands of the refiner. Subsection (d) has to do with the special situation when the person, firm or corporation is engaged in manufacturing *in Baltimore City* who is *also* engaged in business as a jobber or wholesaler, and provides that the goods other than goods of his own manufacture, and used in connection with the business of jobber or wholesaler, shall not be exempt from taxation as personal property. It will be noted that subsection (d) is specifically limited to those engaged in manufacturing "in Baltimore City" *and* who are also operating as jobbers and

wholesalers. Its purpose is to indicate in this special situation, that the personal property used in connection with the alternative business is not included in the general exemption. The *special limitation,* limited to manufacturers in the city who have the dual business, rather emphasizes the *generality* of the language of subsection (a) and, in my opinion, does not indicate any limitation on the generality of that language other than as specifically set forth in subsection (d).

The majority correctly observes that in construing an ordinance an interpretation "should be given to statutory language which will not lead to absurd consequences" citing *B. F. Saul Co. v. West End Park North, Inc.,* 250 Md. 707, 246 A. 2d 591 (1968) and other earlier Maryland cases. Again assuming, for the argument, that the language of subsection (a) is ambiguous and needs construction, in my opinion, the language used does not by any means lead to absurd consequences. As has already been pointed out there is really no doubt in this case that the liquid sulphur storage facility is "used in manufacturing." It is also clear to me from the testimony that but for the "ownership" of the facility by Pan Am, that facility would be exempt from taxation under Ordinance 1340 and under Article 81, § 9 (23). Then too, it is also clear that the new facility supersedes in function in the manufacturing process, personal property which for years received, without objection of the Department, the exemption from taxation under Ordinance 1340. It is not necessary to consider in this case how far and to what extent the manufacturer's exemption may possibly extend. The language of subsection (a) extends to all personal property used entirely or chiefly in connection with manufacturing in Baltimore City and it should be determined on a case to case basis as to whether this test has been met. There is no question in my mind that the facility in this case is so used and is a step in the manufacturing process, "rather than the last step or 'tail end' of a selling and distributing process." Our inquiry in the present case should end with that determination. If it be thought that additional limitations should be applied to the granting of the manufacturer's exemption, the City Council of Baltimore City meets weekly (except during the summer recess and holiday seasons) and appropriate legis-

lation could doubtless be drafted to supply such limitations. It is a legislative, not a judicial, function to supply additional limitations.

Finally, the majority correctly indicates that tax exemptions are to be strictly construed in favor of the taxing authority and against the taxpayer and if "there is real doubt on the subject, that doubt must be resolved in favor of the State." As I see it, however, there is no doubt in regard to the language used in Ordinance 1340 and Pan Am is clearly entitled to the exemption. As Chief Judge Brune, for the Court, aptly said in *Armco Steel Corp. v. State Tax Comm.*, 221 Md. 33, 40-41, 46, 155 A. 2d 678, 681, 684 (1959)—a case involving the exemption granted by a similar provision in subsection (e) of Ordinance 1340:

> "The usual rule in tax exemption cases is that the exemption is to be strictly construed, but it should not be so strictly construed as to defeat the intent of the enacting body [citations omitted]. However, 'strict construction does not require that an unreasonable or unusual meaning must be given to the words used in exemption statutes.' *State Tax Commission v. White-hall Foundation, Inc.*, 214 Md. 316, 320, 135 A. 2d 298. * * *
>
> * * *
>
> "Where the language of a statute or ordinance is clear and unambiguous resort may not be had to extraneous considerations for its construction. *County Treasurer v. State Tax Comm.*, 219 Md. 652, 150 A. 2d 452; *Board of Supervisors of Elections of Balto. v. Weiss*, 217 Md. 133, 141 A. 2d 734; *Bouse v. Hutzler*, 180 Md. 682, 26 A. 2d 767. That is the situation here. The exception says nothing about limiting the exception to ores or unrefined metals 'owned by others.' Such a clause cannot be read into it."

See also *Fair Lanes, Inc. v. Comptroller of the Treasury*, 239 Md. 157, 162, 210 A. 2d 821, 823 (1965).

For these reasons, I would reverse the order of the lower court. I am authorized to state that Judge Marbury concurs in the views herein expressed.