**MANDAN SUPPLY, INC.,**
**Plaintiff-Appellant,**

v.

**Anton STECKLER, Defendant-Appellee.**

**Civ. No. 9204.**

Supreme Court of North Dakota.

July 21, 1976.

Rehearing Denied Aug. 24, 1976.

Kelsch, Kelsch & Tudor, Mandan, for defendant and appellee; argued by William C. Kelsch, Mandan.

PAULSON, Judge.

This is an appeal by the plaintiff, Mandan Supply, Inc., a corporation, from a summary judgment of the Morton County District Court awarding Mandan Supply the sum of $10,203.00 as damages for breach of a retail installment sales contract by the defendant, Anton Steckler. Mandan Supply appeals from such judgment, contending that the district court erred in holding that the finance charge was usurious and also erred in applying the penalty provisions of § 47–14–10, of the North Dakota Century Code.

The facts are not disputed. On August 27, 1974, Anton Steckler entered into a written "Retail Installment Contract (Security Agreement)" with Mandan Supply, for the purchase of a new combine at the cash sale price of $24,845.25. In so doing, Steckler elected to defer payment of $14,-000.00 of the purchase price. The contract, in its statement of the transaction, provides in pertinent part:

Morris A. Tschider, P. C., Bismarck, for plaintiff and appellant; argued by Dennis A. Schneider, Bismarck.

## "STATEMENT OF TRANSACTION
"(Including Disclosures Required by Federal Law)

"1. Cash Price * $ 24,845.25  +  $ 560.00 (sales tax)  $ 25,405.25

"2. Cash Down Payment  $ 560.00

"3. Trade-In . . . [one used combine]
Gross Allowance $ 10,845.25
Less Amount Owing on old contract $_____
Net Allowance  $11,405.25

"4. Total Down Payment (line 2 plus line 3)  $ 11,405.25

"5. Unpaid Balance of Cash Price (line 1 minus line 4)  $ 14,000.00

"6. Other charges:
Insurance (see paragraph 6)  $_____
Fees Paid to Public Officials  $_____  $_____
License, Certificate of Title and Registration Fees  $_____  $ 4.00
Other _____ (specify)  $_____  $_____

"7. Unpaid Balance-Amount Financed * (line 5 plus the sum of those charges in line 6 included in the right hand column)  $ 14,004.00

"8. Finance Charge *  $ 2,500.14

"9. Total of Payments * (line 7 plus line 8)  $ 16,504.14

"10. Deferred Payment Price * (line 4 plus line 9) $ 27,909.39

"11. Annual percentage rate 12.5 %

. . . . . . . . .

" * Inconsistent State Disclosures

"The items of disclosure set forth in the Statement of Transaction are made in compliance with the Federal Truth in Lending Act. The following items required by the North Dakota Retail Installment Sales Act differ only with respect to terminology and are disclosed at the Item numbers indicated: Cash Sale Price at Item 1; Principal Balance at Item 7; Credit Service Charge at Item 8; Time Balance at Item 9; and Time Sale Price at Item 10."

The repayment schedule provided for three unequal and irregular payments of principal over a term of two-and-one-quarter years. The following table illustrates the installments of principal due, along with calculations which both parties agree were used by Mandan Supply in determining the total amount of the "finance charge" of 12.5 percent as stated in the contract:

| Date | Principal | Finance Charge | Total |
|------|-----------|----------------|-------|
| Nov. 27, 1974 (Including $4 filing fee) | $ 3,004.00 | $ 437.64 | $ 3,441.64 |
| Nov. 27, 1975 | 5,500.00 | 1,375.00 | 6,875.00 |
| Nov. 27, 1976 | 5,500.00 | 687.50 | 6,187.50 |
| | $ 14,004.00 | $ 2,500.14 | $ 16,504.14 |

The above table shows that the "finance charge" imposed by Mandan Supply was calculated on the basis of an annual simple interest rate of 12.5 percent as applied to the declining principal balance on each installment due date.

Steckler made none of the required payments, but retains the combine. Mandan Supply brought suit for the contract price of $16,504.14. Steckler, in his answer, admitted nonpayment, but counterclaimed that the contract was usurious and asked the court to impose the usury penalty— which penalty is loss of interest plus loss of twenty-five percent of the principal. § 47–14–10, N.D.C.C. Steckler also asserted a $300.00 damage counterclaim. Mandan Supply, in its reply, denied the counterclaim.

Mandan Supply thereafter moved, pursuant to Rule 56, N.D.R.Civ.P., for summary judgment, contending that it was entitled to judgment as a matter of law because there was no material issue of fact to be resolved. In presenting such motion, the parties stipulated that the sale in question was made pursuant to the Retail Installment Sales Act (Ch. 51–13, N.D.C.C.), and was subject to the "credit service charge" limitation for Class 1 motor vehicles contained in § 51–13–03(1)(A) (Class 1), N.D. C.C. Mandan Supply also agreed that the $300.00 damage counterclaim asserted by Steckler could be offset in the event that Mandan Supply's motion for summary judgment was granted.

The district court granted Mandan Supply's motion for summary judgment, but concluded that the "finance charge" set forth in the contract exceeded the limitation imposed on such charge by § 51–13–03(1)(A) (Class 1), N.D.C.C. The district court also held that the penalty provisions of § 47–14–10, N.D.C.C., were applicable to a retail installment contract which exacted a "credit service charge" in excess of the charge permitted by Chapter 51–13, N.D. C.C. The district court ordered judgment in favor of Mandan Supply in the amount of $10,203.00, representing the contract price of $16,504.14, less the amount of the finance charge, twenty-five percent of the principal balance, and the $300.00 damage counterclaim asserted by Steckler. It is from such judgment that Mandan Supply appeals.

On appeal, Mandan Supply contends that the district court erred in concluding that the "finance charge" set forth in its contract with Steckler violated § 51–13–03(1)(A) (Class 1), N.D.C.C.; or, in the alternative, contends that even if the "finance charge" was in excess of that permitted by such section, the district court erred in applying the penalty provisions of § 47–14–10, N.D.C.C., rather than in applying the penalty provisions of § 51–13–07, N.D.C.C.

The Retail Installment Sales Act (Ch. 51–13, N.D.C.C.) was initially enacted by the Legislature in 1957. It regulates the terms and conditions which may be attached to transactions involving the installment sale of property from a retail seller to a retail buyer. 1959 Report of North Dakota Legislative Research Committee [now Legislative Council] to 36th Legislative Assembly, *Credit Practices—Installment Sales*, pp. 9–11.

There is significant authority for the proposition that retail sales are exempt from usury statutes because the "time-price differential" (credit service charge in Chapter 51–13, N.D.C.C.) is not defined as "interest" within usury statutes such as § 47–14–09 and § 47–14–10, N.D.C.C. Cases so holding are collected in an Annotation at 14 A.L.R.3d 1065. An excellent review of such theory is also found in Warren, *Regulation of Finance Charges in Retail Instalment Sales*, 68 Yale L.J. 839 (1959). Some courts hold otherwise, however, concluding that the only reasonable conclusion is that such finance charges are, indeed, "interest". See, e. g., *Rollinger v. J. C. Penney Co.*, 86 S.D. 154, 192 N.W.2d 699 (1971); *State v. J. C. Penney Co.*, 48 Wis.2d 125, 179 N.W.2d 641 (1970).

We find it unnecessary to reach such question in this case, because we conclude that the Legislature has provided a specific method of regulating transactions where a bona fide retail installment sale is made to a retail buyer.

Section 1–02–07, N.D.C.C., provides:

"*Particular controls general.*—Whenever a general provision in a statute shall be in conflict with a special provision in the same or in another statute, the two shall be construed, if possible, so that effect may be given to both provisions, but if the conflict between the two provisions is irreconcilable the special provision shall prevail and shall be construed as an exception to the general provision, unless the general provision shall be enacted later and it shall be the manifest legislative intent that such general provision shall prevail."

In the instant case, we believe that the provisions of §§ 47–14–09 and 47–14–10, N.D.C.C., are general provisions which, in the absence of specific provisions, may be applicable to finance charges added onto the principal balance in a retail installment sales contract. Section 47–14–09, N.D.C.C., itself states, in part, that its limitations apply "Except as otherwise provided by the laws of this state . . . ." We believe that Chapter 51–13, N.D.C.C., contains the special provisions which fall within the "exception clause" of § 47–14–09, N.D.C.C.

In the instant case, both parties agree that the transaction in question was a bona fide retail installment sale within the terms of Chapter 51–13, N.D.C.C., and that a "retail installment contract" was entered into between Steckler and Mandan Supply. We conclude that the special provisions of Chapter 51–13, N.D.C.C., relating to retail installment sales must govern a transaction such as is presented in the instant case.

The following statutory definitions set forth the application of Chapter 51–13, N.D.C.C., to such transactions, in subsections 1, 2, 3, 4, and 11 of § 51–13–01, N.D.C.C. [S.L.1959, ch. 352, § 1]:

"1. 'Retail buyer' or 'buyer' means a person who buys personal property from a retail seller and who executes a retail installment contract in connection therewith;

"2. 'Retail seller' or 'seller' means a person who sells personal property to a retail buyer under or subject to a retail installment contract;

"3. 'Retail installment sale' or 'sale' means a sale, other than for the

purpose of resale, of personal property by a retail seller to a retail buyer for a time sale price payable in one or more installments, payment of which is secured by a retail installment contract;

"4. 'Retail installment contract' or 'contract' means an agreement, entered into in this state, pursuant to which the title to, the property in or a lien upon personal property, which is the subject matter of a retail installment sale, is retained or taken by a retail seller from a retail buyer as security, in whole or in part, for the buyer's obligation. The term includes a chattel mortgage, a conditional sales contract and a contract for the bailment or leasing of personal property by which the bailee or lessee contracts to pay as compensation for its use a sum substantially equivalent to or in excess of its value and by which it is agreed that the bailee or lessee is bound to become, or has the option of becoming, the owner of the personal property upon full compliance with the terms of the contract;

. . . . .

"11. 'Person' means an individual, partnership, corporation, association or other group, however organized;"

A primary area of regulation by the Retail Installment Sales Act is a limitation on the amount of money which a retail seller may charge the retail buyer for permitting the buyer to defer payment of a portion of the purchase price. For the purposes of Chapter 51–13, N.D.C.C., the following terms—cash sale price, time sale price, official fees, and credit service charge—are defined in subsections 5, 6, 7, and 8 of § 51–13–01, N.D.C.C. [S.L.1959, ch. 352, § 1]:

"5. 'Cash sale price' means the cash sale price stated in a retail installment contract for which the seller would sell to the buyer, and the buyer would buy from the seller, the personal property which is the subject matter of the contract if the sale

were a sale for cash instead of a retail installment sale. The cash sale price may include any taxes, registration, license and other fees and charges for accessories and their installation and for delivering, servicing or improving the personal property;

"6. 'Time sale price' means the sum of the cash sale price, the amount if any included for insurance and other benefits, official fees, and the credit service charge;

"7. 'Official fees' means the filing or other fees required by law to be paid to a public officer to perfect the interest or lien retained or taken by a seller under the retail installment contract, and to file or record a release, satisfaction or discharge of the contract;

"8. 'Credit service charge' means that part of the time sale price by which it exceeds the aggregate of the cash sale price and the amount, if any, included in a retail installment sale for insurance and other benefits and official fees;"

In the instant case, the "finance charge" of $2,500.14 set forth in the contract is the same type of charge as the "credit service charge" permitted under Chapter 51–13, N.D.C.C., and defined by §§ 51–13–01(8) and 51–13–03, N.D.C.C. The $4.00 filing fee referred to in the contract was to be collected by Mandan Supply on the first payment date (November 27, 1974). Such amount, pursuant to § 51–13–02(5)(f), N.D. C.C., is properly treated as part of the "principal balance" for purposes of calculating a "credit service charge". § 51–13–03(1), N.D.C.C.

Section 51–13–03, N.D.C.C. [S.L.1959, ch. 352, § 1], provides:

"*Credit service charge limitation.*—1. A retail seller may contract for in a retail installment contract and charge, receive and collect the credit service charge computed on the principal balance of the contract or obligation from the date thereof to and including the date when

the final installment is payable, at not exceeding the following rates:

A. As to motor vehicles

*Class 1. Any motor vehicle designated by the manufacturer by a year model not earlier than the year in which the sale is made, not more than seven dollars per one hundred dollars.* [Emphasis added.]

Class 2. Any motor vehicle not in Class 1 designated by the manufacturer by a year model of not more than four years prior to the year in which the sale is made, not more than ten dollars per one hundred dollars.

Class 3. Any motor vehicle not in Class 1 or 2, not more than thirteen dollars per one hundred dollars.

B. As to goods other than motor vehicles, ten dollars per one hundred dollars per annum.

"2. Such credit service charge shall be computed on the principal balance as determined under subsection 5 of section 51–13–02 on contracts payable in successive monthly installments substantially equal in amount extending for a period of one year. On contracts providing for installments extending for a period less than or greater than one year, the credit service charge shall be computed proportionately.

"*3. When a retail installment contract provides for unequal or irregular installments, the credit service charge shall be at the effective rate provided in subsection 1, having due regard for the schedule of installments.* [Emphasis added.]

"4. The credit service charge shall be inclusive of all charges incident to investigating and making the contract, and for the extension of the credit provided for in the contract and no fee, expense or other charge whatsoever shall be taken, received, reserved or contracted for except as provided in this section and in subsection 7 of section 51–13–02 and in section 51–13–06 and for those items expressly provided for in the retail installment contract as set forth in subsection 5 of section 51–13–02."

A "motor vehicle", for purposes of Chapter 51–13, N.D.C.C. [S.L.1959, ch. 352, § 1], is defined in § 51–13–01(12) as follows:

"12. 'Motor vehicle, new and used' as used in this chapter, shall include automobiles, motor trucks, motorcycles, house trailers, trailer-coaches, cabin trailers, semitrailers, trailers, road tractors, farm tractors, farm machinery mounted upon, drawn by, or attached to farm tractors, and all vehicles with any power, other than muscular power, except, however, any vehicles which run only on rails."

Both parties agree that the retail installment sales contract in the instant case is governed by the limitation set forth in class 1 of subdivision A of subsection 1 of § 51–13–03, N.D.C.C.[1] Consequently, the maximum "credit service charge" which Mandan Supply could levy on the retail installment sale of the combine to Steckler was $7.00 per $100.00 of the unpaid portion of the "cash sale price", which, in the instant case, is $14,000.00.

The district court, in determining whether or not the "finance charge" set forth in the contract exceeded the limitation imposed by § 51–13–03(1)(A) (Class 1), calculated that the maximum "credit service charge" permitted by such statute was $2,205.00. In making such determination, the district court applied the following formula:

1. Subsection 5 of § 51–13–02, N.D.C.C., provides for an alternative method of determining the maximum "credit service charge" which may be imposed by the seller. Such provision permits "simple interest charge not exceeding seven percent per year computed on the principal balance unpaid from time to time". There is no dispute that, in the instant case, such method of determining the "credit service charge" was not used by Mandan Supply.

Maximum rate of $7.00 per $100.00 $\times$ 140 = $ 980.00
$\times$ 2¼ years = $2,205.00

In determining whether or not the formula applied by the district court in the instant case was correct, we are called upon to construe the language of § 51–13–03(3), N.D.C.C., which provides:

"3. When a retail installment contract provides for unequal or irregular installments, the credit service charge shall be *at the effective rate provided in subsection 1, having due regard for the schedule of installments.*" [Emphasis added.]

Such statute permits Mandan Supply to charge a "credit service charge" on the sale of the combine "at the effective rate" of $7.00 per $100.00 "add-on" rate, "having due regard for the schedule of installments".

Steckler contends that the "effective rate" provision of § 51–13–03(3), N.D.C.C., refers to the maximum dollar amount of the credit service charge which would be generated by calculating such credit service charge as if repayment were required to be made in successive, equal and regular installments, pursuant to § 51–13–03(2), N.D.C.C. In the instant case, such method would generate a credit service charge of $2,205.00, the same amount determined by the district court to be permissible. In addition, Steckler further contends that the language of § 51–13–03(3), N.D.C.C., requiring "due regard" for the repayment schedule requires a proportionate reduction in the credit service charge of $2,205.00, because Steckler was obligated to pay a higher percentage of the principal balance in three months than he would normally be obligated to pay in an equal and monthly repayment transaction.

Mandan Supply, however, contends that the "effective rate" language refers to the equivalent "annual percentage rate" which a $7.00 per $100.00 "add-on" rate generates. Consequently, Mandan Supply asserts that § 51–13–03(3), N.D.C.C., permits it to charge a "credit service charge" at whatever effective percentage rate the $7.00 per $100.00 "add-on" rate translates into. Mandan Supply has introduced into evidence a pamphlet entitled *"Financial Rate Translater and Guide to Legal Instalment Sales Rates".*[2] In the "Explanation" of such pamphlet, at page 3 thereof, it is stated:

"EXPLANATION

"Traditionally the return on money invested is stated as an annual interest rate on the funds actually in use. For monthly payment loans the interest rate per month is 1/12 of the annual interest rate. In these tables we shall call this *annual* interest rate the *actuarial* rate. It is exactly the same rate you talk about for a G.I. mortgage, or an FHA mortgage or any other direct reduction loan. It is exactly what the Federal Reserve means when it refers to the 'Annual Percentage Rate' under Truth-In Lending. The actuarial rate expresses the true return on an investment.

"Forty states and the District of Columbia now have statutes specifying the maximum finance charge on auto or other installment finance, most of them expressing this maximum rate as an 'add-on'; that is, the charge per $100 of original balance per year applied for the full term. The actuarial interest rate on funds actually in use is something less than double the stated rate of charge." [Emphasis in original.]

The table entitled "Actuarial Equivalents of Add-On Rates", contained in such pamphlet, on pages 4–5 thereof, shows that the translated percentage rate is approximately 12.9 percent, based on an "add-on" rate of $7.00 per $100.00 per annum on a contract paid off in 2¼ years in equal monthly installments. Therefore, Mandan Supply asserts that since the contract assessed a "credit service charge" of only 12.5 percent on an irregular and unequal repayment schedule, such charge was within the

---

2. Prepared by Financial Publishing Company, 82 Brookline Avenue, Boston, Massachusetts (Chart 691769 Rev.).

maximum permitted, i. e., approximately 12.9 per cent.

Finally, Mandan Supply contends that the language of § 51–13–03(3), N.D.C.C., requiring that "due regard" be given to the schedule of installments, means that the "credit service charge", on an unequal or irregular repayment contract, must be calculated on the basis of the declining principal balance when each installment is due. As such a method of calculation was used by Mandan Supply in the instant case, it asserts that it fully complied with Chapter 51–13, N.D.C.C., in determining the amount of the "credit service charge" assessed on its installment contract with Steckler.

The "add-on" method of calculating finance charges is one of the three methods usually specified by statutes which regulate charges for the extension of credit. The calculation of finance charges is explained in Warren, *Regulation of Finance Charges in Retail Instalment Sales,* 68 Yale L.J. 839, 853 (April 1959), as follows:

"The finance charge maxima prescribed by these statutes are liberally drawn in favor of the financer. Of the three methods of calculating finance charges usually specified—add-on, discount, and interest on the unpaid balance—the add-on method is most common, having been incorporated into the majority of the statutes regulating instalment sales of durable consumer goods. This method simply entails adding the finance charge to the amount the buyer finances, and is the system ordinarily used by dealers in computing finance charges on such goods. A statutory add-on maximum of six dollars per one hundred dollars of the principal balance finance does not limit the dealer to a true interest rate of six per cent, for the buyer does not have the use of the entire principal balance for the whole year. Since he is discharging his obligations by monthly payments and has the use, on an average, of only slightly more than one-half of the original principal balance throughout the year, the true interest rate on a six per cent add-on charge is something over eleven per cent.[50] When this method of

"[50] The true or effective interest rate is sometimes estimates at about twice the add-on rate, but this yields a figure somewhat too high." [Footnote 49 omitted.]

computation is understood, it is possible to appreciate the economic significance of add-on charges permitted by various state statutes to run from six to nine per cent on new cars, nine to thirteen per cent on late model used cars, and twelve to seventeen per cent on older used cars.

.   .   .

.   .   .   .   .

With the advent of "Truth-in-Lending" legislation, disclosure of a finance charge in terms of, for example, $7.00 per $100.00 add-on, is prohibited, and lenders (or installment sellers) must disclose all finance charges in terms of the "annual percentage rate". Consumer Credit Protection Act, Public Law 90–321, 82 Stat. 146 *et seq.,* 15 U.S.C. § 1601 *et seq.;* Federal Reserve System, Regulation Z, 12 C.F.R. § 226.1 *et seq.* (1976). By the use of "translator tables", lenders (or sellers) are able to translate the "add-on" finance charge into an "annual percentage rate" for the purposes of complying with the disclosure requirements of federal law. In the instant case, such translation shows that, over the course of a 2¼-year repayment period, a $7.00 per $100.00 and add-on "credit service charge" yields a return equivalent to a simple interest rate of approximately 12.9 percent, where repayment is calculated in equal monthly installments on a declining balance basis.

Therefore, the seller, in a bona fide retail installment sale, where the maximum permissible "credit service charge" on an equal, monthly repayment schedule (on 2¼ years) is $7.00 per $100.00 add-on, is permitted to assess a "credit service charge" which yields a return equivalent to a "true interest rate" (or "actuarial interest rate" or "annual interest rate") of approximately 12.9 percent simple interest per annum.

Based upon such conclusion, we must therefore determine whether or not Mandan Supply assessed a "credit service charge" in the instant case within the limits

prescribed for an irregular or unequal repayment transaction. Our determination of such issue is governed by § 51–13–03(3), N.D.C.C., which is set forth earlier in this opinion.

▮ In construing statutes, it is axiomatic that the courts will look to the entire statute and construe every other part or section so as to produce a harmonious whole. 2A Sutherland, Statutory Construction § 46.05, p. 56 (Callaghan & Company 1973). Furthermore, effect must be given to every word, clause, and sentence of the statute. 2A Sutherland, *supra* at § 46.06, p. 65. In the instant case, § 51–13–03, N.D. C.C., permits a "credit service charge" at the "effective rate" of $7.00 per $100.00 add-on [§ 51–13–03(1)] "having due regard for the schedule of installments". As we noted earlier, the add-on rate of $7.00 per $100.00 in an equal, monthly repayment contract is equivalent to an annual percentage rate of approximately 12.9 percent. We believe that § 51–13–03(3), N.D.C.C., therefore permits a retail seller to assess on an unequal or irregular repayment contract a "credit service charge" which would yield a return of up to approximately 12.9 percent per annum.

The question of computing effective interest rates (similar to the "credit service charge" under discussion in this case) is discussed in Neifeld, Neifeld's Guide to Instalment Computations (Mack Publ.Co.1953) [hereinafter cited as *Neifeld*]. In *Neifeld, supra* at page 60, a distinction between the "nominal interest rate" and the "effective interest rate" is drawn, and the "effective interest rate" is described as follows: [3]

*"Effective Interest Rate*

"The *effective interest rate* is the rate actually earned per year. It takes into account the conversions into principal of the interest earned at each rest period during the year. An effective interest rate is also called a *real interest rate,* or a *true interest rate,* because it tells instalment sellers and financing institutions the real earning power of the funds they invest. . . . " [Emphasis in original.]

▮ While the statute itself does not define the term "effective rate",[4] it is clear from the above discussion that an "effective rate" is merely another means of quantifying the resulting return which a lender receives for extending credit. *Cf. B. F. Saul Company v. West End Park North, Inc.,* 250 Md. 707, 246 A.2d 591 (1968). We conclude that, in the context presented by § 51–13–03(3), N.D.C.C., the term "effective rate" is identical to the "actuarial rate" (or "annual percentage rate") of simple interest which a transaction governed by § 51–13–02, N.D.C.C., (equal and regular installment payments) yields to the seller. In other words, where the "annual percentage rate" of simple interest actually charged is less than approximately 12.9 percent, there is no violation of § 51–13–03, N.D.C.C.

▮ Finally, we must also consider the statement in § 51–13–03(3), N.D.C.C., which requires that "due regard" be given the schedule of installments. We perceive no other meaning for such phrase but that, in an unequal or irregular repayment transaction, the seller must calculate the "credit service charge" on the declining principal

3. The formulas used in preparing rate translator charts, along with the underlying theory supporting such formulas, is amply discussed in *Neifeld, supra* at pp. 60–64.

4. An example of a clearer statute is found in California [Cal.Civil Code § 1801 *et seq.* (West 1973)], where the finance charge limitations are expressed in percentage terms. Such expressions of finance charge limitations more clearly indicate legislative intent; as well as making it easier for the general public and the courts to understand the true nature of finance charges. The "add-on" method has long been criticized as being unfair and confusing, and exists today only where state statutes retain references to the add-on method in setting forth maximum finance charge limitations. The phrases "effective rate" and "having due regard for the schedule of installments" are not defined in Chapter 51–13, N.D.C.C., and, in themselves, are not subject to precise meanings. The interpretation becomes more difficult because the meaning of such phrases must be secured from the context in which such phrases are used. Revision of our statutes to reflect current trends in the field would certainly prove a service to all concerned.

balance as installment payments are due and payable. Such method is fair to both parties, because the seller is compensated for his expense in deferring payment as long as such account remains outstanding, but the buyer receives the benefit of paying a smaller "credit service charge" whenever a substantial reduction in the principal balance occurs.

In the instant case, Mandan Supply calculated the "credit service charge" at the annual percentage rate of 12.5 percent on the declining principal balance. In light of the above discussion, we conclude that such method complies with § 51–13–03(3), N.D. C.C. Consequently, Mandan Supply is entitled to recover the entire contract price, which price is $14,004.00, plus finance charges and accrued interest pursuant to the contract, less the $300.00 counterclaim agreed to by stipulation of the parties, plus its costs and disbursements.

Having concluded that Mandan Supply did not violate the "credit service charge" limitations specified in § 51–13–03, N.D.C.C., neither the penalty provided in § 47–14–10 nor the penalty provided in § 51–13–07, N.D.C.C., is applicable in the instant case. However, we believe that where a bona fide retail installment sales contract assesses a "credit service charge" in violation of § 51–13–03, N.D.C.C., the penalty provisions in § 51–13–07, N.D.C.C., apply.

The judgment of the district court is reversed and the case is remanded for disposition consistent with this opinion.

ERICKSTAD, C. J., and SAND, PEDERSON and VOGEL, JJ., concur.